AUTO–OWNERS INSURANCE COMPANY, Appellant,

v.

NEWMECH COMPANIES, INC., et al, Defendants,

and

Brighton Development Corporation, Respondent.

No. A03–1062.

Court of Appeals of Minnesota.

April 27, 2004.

478

Timothy P. Tobin and Sarah M. Aho, Gislason & Hunter, LLP, Minnetonka, MN, for appellant.

Patrick J. O'Connor and Katherine L. McGill, Faegre & Benson, LLP, Minneapolis, MN, for respondent.

Considered and decided by RANDALL, Presiding Judge, KLAPHAKE, Judge, and HARTEN, Judge.

## OPINION

RANDALL, Judge.

Appellant insurer brought a declaratory judgment action for a declaration as to its obligations under an insurance policy issued to respondent. Respondent developed a condominium building in which mold developed as a result of a faulty mechanical system that pulled moisture into the building. Respondent sought coverage for its cost of property damage, a lawsuit by several tenants, and related costs. The district court granted summary judgment to respondent, finding coverage and awarding costs and attorney fees. On appeal, appellant argues (a) the policy did not provide coverage because respondent breached the cooperation clause by failing·to consult with its insurer and obtain consent before entering into repair agreements; and (b) other exclusions apply; and (c) the award of costs and attorney fees was error. We affirm.

## FACTS

Respondent, Brighton Development Corporation ("Brighton") is a developer of

multi-unit residential property. On July 14, 1999, Brighton contracted with Kraus–Anderson Construction Company ("Kraus"), to build the Stone Arch Lofts (the "Project"), a new seven-story, 36–unit condominium building located on the Riverfront in Minneapolis. The contract provided that Paul Madson & Associates, Ltd. ("Madson") was to perform the architectural work. The contract also permitted Kraus to subcontract with NewMech Companies, Inc. ("NewMech") to provide the mechanical and electrical systems for the Project.

Construction on the Project began in July 1999, and was scheduled for completion at the end of November 2000. In the meantime, Brighton entered into purchase agreements for the completion of particular condominium units with new unit owners. Brighton also secured a Tailored Protection Policy from appellant, Auto–Owners Insurance Company ("Auto–Owners"). The policy included a Commercial General Liability Policy (the "Policy"), which has been in effect since September 15, 1999.

By December 2000, the Project was substantially complete and the first residents began to move into their units. Less than a year later, in August 2001, some condominium unit owners began experiencing excessive humidity conditions. The excessive moisture caused several units to be severely damaged. This damage included water damage to the sheet-rock that caused mold growth, and warping of the floors, cabinets and other millwork.

In an effort to investigate the problem and determine the appropriate remedy, Kraus hired Legend Technical Services, Inc. ("Legend") to evaluate the building. Legend reported that there was extensive water damage throughout the building and that there was mold growth in approximately one-half of the units. Brighton and Kraus also investigated the problem and concluded that the air system was defective. Rather than producing a positive pressure, the system created a negative pressure that drew excessively moist outside air into the building's interior.

On January 14, 2002, Brighton sent a letter to Auto–Owners notifying them of the property damage that occurred at the Project and its plans to remedy the situation. The letter informed Auto–Owners that unit owners were demanding repairs to their units and that defects in the mechanical system be cured. The letter also informed Auto–Owners that Brighton was engaged in negotiations with Kraus for a Rework Agreement to repair the damage and fix the mechanical system.

Brighton, Kraus, and NewMech signed the Rework Agreement on January 24, 2002. In the agreement, the parties agreed that Kraus and NewMech would perform corrective work on the Project and Brighton would accomplish whatever temporary relocation of unit owners was required to complete the repair efforts. Shortly thereafter, on January 28, 2002, Auto–Owners notified Brighton that the claims against them might not be covered under the policy.

After receiving the January 28, correspondence from Auto–Owners, Brighton reached an agreement (the "Repair Agreement") with the Condominium Association ("Association") to repair the condominiums. Similar agreements were subsequently entered into between Brighton and various individual owners throughout the winter and spring of 2002. According to Brighton, the primary purpose of these repair agreements was to allow Brighton, Kraus and NewMech to gain access to the units and common areas to undertake repairs.

Despite the efforts to repair the damaged units, three unit owners commenced a lawsuit against Brighton and Kraus on July 25, 2002, alleging that the condominium units were not fit for their ordinary purpose. A few days later, a copy of the complaint was forwarded by Brighton to Auto–Owners. In this letter, Brighton tendered this lawsuit to Auto–Owners for defense and indemnity. On August 13, 2002, counsel for Auto–Owners responded to Brighton informing them that although the insuring clause was arguably triggered, Auto–Owners denied coverage based on Brighton's alleged violation of the cooperation clause in the policy as well as a denial based on various exclusions of coverage contained in the policy.

After being informed by Auto–Owners that neither a defense nor indemnity was afforded under the Policy, Brighton settled the lawsuit with the three condominium unit owners. However, the insurance coverage issues were still in dispute. To resolve the coverage issues, Auto–Owners commenced this declaratory judgment action by service of a complaint for declaratory relief on November 12, 2002. Both parties moved for summary judgment. On May 20, 2003, the district court entered judgment in favor of Brighton on its motion for summary judgment. The court determined that Brighton did not breach the cooperation clause by entering into the Repair Agreements because Auto–Owners denied coverage in the January 28 correspondence. The court then determined that none of the policy exclusions were applicable and that Brighton was entitled to coverage under the policy.

On June 27, 2003, Brighton filed a motion to amend the court's Order to add attorney's fees and costs incurred by Brighton in the amount of $36,765.25. The court amended its previous Order to include attorney's fees based on Brighton's

affidavit of fees and costs incurred. This appeal followed.

## ISSUES

I. Did the district court err by granting summary judgment in favor of Brighton on the basis that Auto–Owner's insurance policy covers the claims against Brighton?

II. Did the district court err by granting attorney's fees in favor of Brighton?

## ANALYSIS

### I.

■ On appeal from summary judgment, this court determines whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). In making this determination, this court reviews the evidence in the light most favorable to the party against whom summary judgment was granted. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993). The question of whether an insurer has a duty to defend is a legal question subject to de novo review. *Metro. Prop. Cas. Ins. Co. v. Miller*, 589 N.W.2d 297, 299 (Minn.1999). Interpretation of an insurance policy and application of the policy to the facts in a case are questions of law that this court reviews de novo. *Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn.2001).

Here, Auto–Owners contends that its insurance policy does not cover Brighton's losses because (1) Brighton breached its duty to cooperate when it entered into the Repair Agreements without Auto–Owners' consent; and (2) various policy exclusions operate to eliminate coverage.

### A. Cooperation Clause

■ The insurance policy issued by Auto–Owners contains a paragraph that is

generally referred to as the "cooperation clause." Paragraph 2(d) of that section, which is referred to at the "voluntary payments" clause, provides:

No insured will, except at that insured's own cost, voluntarily make payment, assume any obligation, or incur any expense other than for first aid, without our consent.

Auto–Owners claims that by its failure to consult with Auto–Owners and obtain its consent prior to entering into the Repair Agreements, Brighton breached the cooperation clause contained in the insurance policy and thereby forfeited its right to coverage under the policy.

It is clear that a breach of the cooperation clause, which is material and prejudices the insurer, can void coverage under the policy. *Steen v. Those Underwriters at Lloyds*, 442 N.W.2d 158, 162 (Minn.App. 1989); *see also Juvland v. Plaisance*, 255 Minn. 262, 268–69, 96 N.W.2d 537, 541–42 (1959). But when an insurance company completely denies coverage, the insured may independently enter into a settlement agreement in order to "extricate himself or herself." *Buysse et al. v. Baumann–Furrie & Co.*, 448 N.W.2d 865, 872 (Minn. 1989).

Here, Brighton argues that Auto–Owner's "breach of cooperation" defense fails, arguing that Auto–Owners has no standing to consent or withhold consent from Brighton's "Repair Agreements" because Auto–Owners denied coverage for Brighton's losses. In support of this position, Brighton points to paragraph two of the January 28, 2002 letter, which states that "any costs claimed for the repair and correction of Brighton's work is (sic) specifically excluded under the policy."

Auto–Owners asserts that they did not deny coverage in the January 28 letter. Auto–Owners claims that the purpose of the letter was to advise Brighton that any further investigation of the claims was being conducted "under a reservation of rights." Auto–Owners contends that the letter did not act as a complete denial of coverage, arguing that the letter did not contain specific language denying all claims, and, therefore, the "breach of coverage" defense is still open. We disagree. The January 28 correspondence is not a standard reservation of rights letter. Auto–Owners can argue that it is, but the letter was not titled as such. The letter does not lead off with that clear statement in the first paragraph that states "[d]ear insured: This is a reservation of rights letter. If you have any questions, consult competent legal advice." Chronologically the letter followed Brighton's first inquiry, and then the second paragraph states:

Your policy of insurance does not guarantee or warranty your work. Therefore, any cost claimed for the repair or correction of your work is specifically excluded under this policy of insurance.

The second paragraph of the January 28 letter looks like a denial of coverage letter rather than a reservation of rights. The letter does get around to an inference that it is a reservation of rights letter in the last two paragraphs. But taking the document as a whole, we conclude that the document is not a "reservation of rights" letter on its face, meaning it now has to be looked at in the context of the whole file, and we find Brighton's interpretation that the letter was a denial of coverage to be a reasonable interpretation.

Brighton's attorneys kept demanding coverage, but as Brighton asserts, an insured and its attorneys don't stop asking for coverage just because there is an initial denial. An insured is entitled to press its point that there is coverage even in the face of a denial. An insured has a right to protect itself when it is reasonable to assume there is no insurance coverage forth-

coming, and we conclude, as did the district court, that Brighton was justified in entering into Repair Agreements to mitigate damages and their monetary losses.

The record is self-evident that both Brighton and Auto–Owners "jockeyed" to get the best advantage for their respective positions. That is nothing more than prudent and reasonable legal tactics on both sides. On appellate review, we cannot find any abuse of discretion or reversible error.

## B. Policy Exclusions

 Auto–Owners contends that various policy exclusions operate to eliminate coverage. These policy exclusions are: (1) the contractual liability exclusion or "exclusion b;" and (2) the Business Risk Exclusions, which include exclusion j(2), exclusion m, and exclusion n. "[A]n insurer has the burden of proving that a policy exclusion applies," and courts read such exclusions "narrowly against the insurer." *State Farm Ins. Cos. v. Seefeld,* 481 N.W.2d 62, 64 (Minn.1992). Ambiguities in a policy are generally resolved in favor of the insured. *Nathe Bros., Inc. v. American Nat'l Fire Ins. Co.,* 615 N.W.2d 341, 344 (Minn.2000).

### 1. The Contractual Liability Exclusion

██ The Contractual Liability Exclusion or "exclusion b," negates coverage for any damages the insured must pay "by reason of the assumption of liability in a contract or agreement." Auto–Owners asserts that since the Homeowners' Complaint made specific reference to Brighton's liability based upon the Agreements with the Homeowners, Brighton has assumed liability in those Agreements.

A review of the insurance contract reveals that exclusion b does not apply because there is an exception to exclusion b. This exception states that the "exclusion does not apply to liability for damages . . . . (2) that the insured would have in the absence of the contract or agreement." Notwithstanding the Repair Agreements (contractual binding Brighton to undertake repairs), Brighton was legally liable for the damage to the condominium units. The damage was less than a year old and statutory warranties were applicable. Brighton was the developer and sold the units to various individuals. Consequently, Brighton would have been liable to the unit owners with our without the Repair Agreement. We conclude exception (2) applies and negates exclusion b.

### 2. The Business Risk Exclusions

██ The remaining exclusions that apply include exclusions (j), (m), and (n). In determining whether these three exclusions apply, the primary issue becomes whether the Project constituted "Brighton's work." "Brighton's work" or "your work," as it is referred to in the policy, is defined in the policy as:

(a) Work or operations performed by you or on your behalf; and

(b) Materials parts or equipment furnished in connection with such work or operations.

The policy further provides that "your work" includes:

(a) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

(b) The providing of or failure to provide warnings or instructions.

Auto–Owners contends that because Brighton was the developer they should be viewed as an "owner" and not as a contractor, and therefore the "work" was not Brighton's "work," but was actually Kraus and NewMech's work. We disagree. Brighton is a developer, and as a develop-

er its work is to develop projects. Brighton did hire others to design and build the Project, but the policy specifically states that Brighton's work "is defined in the policy as .... [w]ork or operations performed by you or on your behalf." The work provided by Kraus and NewMech and their subcontractors was work done specifically on Brighton's behalf. It cannot be argued that the contractors and the subcontractors did their work idly and for their own reasons.

Auto–Owners argues that the phrase "work performed on Brighton's behalf," refers to work that Brighton was obligated to perform and assign to others. Auto–Owners claims that because Brighton did not hire subcontractors but rather only hired contractors, it was somehow not responsible for the work and therefore the work cannot be considered Brighton's "work." We do not follow the argument. All the work performed by the contractors and the subcontractors was performed "on Brighton's behalf." The work was necessary to develop the project and Brighton was ultimately responsible for the finished project.

### a. Exclusion j

■ Exclusion j(2) negates coverage for property damage to premises that the insured sold if the property damage arises out of any part of those premises. The exception to this exclusion applies if the premises constitute Brighton's "work." Auto–Owners contends that because units were sold, this exclusion applies. Auto–Owners also contends that because the project was not Brighton's "work," the exception to the exclusion does not apply. Consequently, Auto–Owners claims that exclusion j(2) bars Brighton from recovery under the policy.

Auto–Owners correctly asserts that the exclusion applies because the units were sold. Brighton never occupied the condominiums nor were they ever rented or held for rental by Brighton. As stated above, the Project is Brighton's "work." We again conclude that the exception to exclusion j applies and, thus, the exclusion does not deny coverage to Brighton.

### b. Exclusion m

■ Exclusion m is generally referred to as the "impaired property" exclusion. This exclusion precludes coverage to "property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product;" or "your work;" or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

The term "impaired property" is defined to mean "tangible property" other than "your product" or "your work."

Auto–Owners argues that since the Project is not Brighton's "work," the definition of "impaired property" has been satisfied and the exclusion applies. Again, the Project is considered Brighton's "work," and Auto–Owners' contention fails.

### c. Exclusion n

■ Finally, exclusion n applies to preclude coverage to:

Damages claimed for any loss, cost, or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product;"

(2) "Your work;" or

(3) "Impaired property."

Auto–Owners contends that because the Project constituted "impaired property," this exclusion applies.

Some of the units sustained damage due to the defective make-up air system. Brighton agreed to repair the damage. The units were never *withdrawn* from the market in the sense of the policy; rather, they were just repaired. If you took Auto–Owners literally, there would never be coverage for any loss as, arguably, nothing needing repairs from a covered loss is "impaired." Exclusion n does not apply.

None of the various policy exclusions do operate to eliminate coverage, and summary judgment was properly granted in favor of Brighton.

## II.

The district court awarded costs and attorney's fees to Brighton in the amount of $36,765.25. Auto–Owners contends that the award was an error because Auto–Owners was entitled to discovery and an evidentiary hearing to test the reasonableness of the costs and attorney's fees. "On review, this court will not reverse a trial court's award or denial of attorney fees absent an abuse of discretion." *Becker v. Alloy Hardfacing & Eng'g. Co.*, 401 N.W.2d 655, 661 (Minn. 1987).

Brighton's attorneys submitted affidavits detailing the appropriate amount of costs and attorney's fees that should be awarded. The district court determined that the amount was reasonable. Moreover, the cases cited by Auto–Owners do not stand to support the argument that Auto–Owners is entitled to discovery and an evidentiary hearing in order to test the reasonableness of the attorney's fees. The district court did not abuse its discretion by awarding costs and attorney's fees to Brighton.

## DECISION

The January 28 correspondence was not a reservation of rights letter, but rather the letter denied coverage for Brighton's losses under the insurance policy. Because Auto–Owners denied coverage, Brighton did not breach the cooperation clause by entering into the Repair Agreements. None of the policy exclusions operate to eliminate coverage under the policy. We conclude that the district court properly granted summary judgment in favor of Brighton.

**Affirmed.**